O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIC RIOS, an individual,<br><br>               Plaintiff,<br><br>     v.<br><br>COUNTY OF LOS ANGELES, a public entity,<br>and DOES 1 to 100, inclusive,<br><br>               Defendants. | Case No.: 2:24-cv-04782-MEMF-MBK<br><br>**ORDER GRANTING PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE [DKT. NO. 68] AND GRANTING IN PART AND DENYING IN PART DEFENDANTS COUNTY OF LOS ANGELES AND DEPUTY TY SHELTON'S MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE PARTIAL JUDGMENT [DKT NO. 41-1]** |

     Before the Court is the Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment, filed by Defendants County of Los Angeles and Ty Shelton. Dkt. No. 41-1. Also before the Court is Plaintiff's Request for Judicial Notice. Dkt. No. 68. For the reasons that follow, the Court GRANTS Plaintiff's Request for Judicial Notice, and GRANTS IN PART and DENIES IN PART Defendants' Motion for Summary Judgment.

/ / /

/ / /

# BACKGROUND

### I.    Factual Background

On March 3, 2023, the Lancaster Station of the Los Angeles County Sheriff's Department received a call reporting criminal threats made by a member of the public at the Toyota of Lancaster car dealership. Sheriff's Deputies responded to the dealership and identified a residence where they believed the suspect—later identified as Jose Medrano—might be found. Deputies Ty Shelton and Marissa Gonzalez went to the residence to detain Medrano. While the Deputies were at the residence, Medrano exited the residence and ran towards a nearby elementary school. Deputies Shelton and Gonzales pursued Medrano onto the school grounds. The parties dispute what exactly happened next, but Gonzales eventually apprehended Medrano, and Shelton eventually detained an innocent bystander, Eric Rios, a custodian at the elementary school.

Rios alleges that Deputy Shelton and the County of Los Angeles, through Deputy Shelton's actions, violated his civil rights when Deputy Shelton detained him on the school grounds. Defendants deny all allegations and assert that Deputy Shelton's actions were lawful, in large part because he reasonably believed Rios was Medrano when he detained him.

### II.    Procedural History

On April 12, 2024, Plaintiff Eric Rios filed a complaint in Los Angeles County Superior Court against Defendants County of Los Angeles and Los Angeles County Sheriff's Department ("LASD") Deputies DOES 1-100, later naming only Deputy Ty Shelton as DOE 1 (collectively "Defendants"). Dkt. Nos. 1-1, 41-6.[1] Plaintiff's complaint alleges seven causes of action: (1) unreasonable seizure / excessive force, 42 U.S.C. § 1983; (2) municipal liability for failure to train, 42 U.S.C. 1983; (3) municipal liability for unconstitutional custom, practice, or policy, 42 U.S.C. § 1983; (4) negligence, Cal. Gov. Code Section 820; (5) assault and battery, Cal Gov. Code Section 820 and California Common Law; (6) intentional infliction of emotional distress; and (7) violation of the Bane Act, Cal. Civ. Code Section 52.1. *See* Dkt. No. 1-1. On June 7, 2024, the case was removed to federal court. Dkt. No. 1. On June 27, 2025, Defendants filed the instant, fully integrated Motion

---

[1] Plaintiff's amendment to his complaint naming Shelton as "Doe 1" was filed on May 8, 2024. Dkt. No. 41-6.

for Summary Judgment, or in the Alternative Partial Judgment, which includes Plaintiff's Opposition and Defendants' reply to Plaintiff's opposition. Dkt. No. 41-1 ("Motion"). On October 2, 2025, the Court held a hearing on the Motion, and Plaintiff filed a Request for Judicial Notice. Dkt. No. 68 ("RJN"). Defendants filed an Opposition to the RJN on October 6, 2025. Dkt. No. 70.

### III.    **Plaintiff's Request for Judicial Notice**

A court may judicially notice facts that: "(1) [are] generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b). Under this standard, courts may judicially notice "undisputed matters of public record," but generally may not notice "disputed facts stated in public records." *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1125–26 (9th Cir. 2002). Plaintiffs request that the Court judicially notice the following records:

1. *U.S. v. County of Los Angeles et. al*, "Settlement agreement", Dkt. No. 68-2, Ex. 1, Pages 5, 26-29, 44-45, 56-58,
2. LASD posts and references to the Antelope Valley Monitor and its semi-annual reports on the LASD website, Dkt. No. 68-3, Ex. 2.
3. Antelope Valley Monitoring Team's 15th Semi-Annual Report, National Council on Crime & Delinquency, December 2022, Dkt. No. 68-4, Ex. 3, Page 49;
4. Antelope Valley Monitoring Team's 16th Semi-Annual Report, National Council on Crime & Delinquency, June 2023, Dkt. No. 68-5, Ex. 4, Pages 1-2, 45;
5. LASD MT Semi-Annual Reports Data – December 2022 through June 2025, Dkt. No. 68-6, Ex. 5

*See* RJN.

The Court takes judicial notice of all the documents as those records constitute court filings and other matters of public record that are verifiable. *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741 n.6 (9th Cir. 2006) (explaining that it is appropriate to take judicial notice of court filings and other matter of public record, such as filings in other litigation as they are readily verifiable). Those exhibits are referenced in Plaintiffs' respective *Monell* claims and are public records such that their existence and contents (i.e., the fact that these documents exist and that they contain the words they contain) cannot reasonably be disputed. Defendants contest Plaintiff's RJN, but the Court rejects the Opposition and will take judicial notice since it is undisputed they are

1   matters of public record within the meaning of Federal Rule of Evidence 201. Thus, the documents

2   are properly subject to judicial notice. *See* Fed. R. Evid. 201(b)(2). The Court will take judicial

3   notice of these documents, but not of any disputed facts contained therein.

4       **IV.    <u>Applicable Law</u>**

5           **A. Motion for Summary Judgment**

6           Summary judgment should be granted if "the movant shows that there is no genuine dispute

7   as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P.

8   56(a). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists &*

9   *Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*,

10  477 U.S. 242, 248 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could

11  return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. A court must view the facts

12  and draw inferences in the manner most favorable to the nonmoving party. *United States v. Diebold,*

13  *Inc.*, 369 U.S. 654, 655 (1962); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992).

14  "A moving party without the ultimate burden of persuasion at trial—usually, but not always, a

15  defendant—has both the initial burden of production and the ultimate burden of persuasion on a

16  motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102

17  (9th Cir. 2000). To carry its burden of production, the moving party must either: (1) produce

18  evidence negating an essential element of the nonmoving party's claim or defense; or (2) show that

19  there is an absence of evidence to support the nonmoving party's case. *Id.*

20          Where a moving party fails to carry its initial burden of production, the nonmoving party has

21  no obligation to produce anything, even if the nonmoving party would have the ultimate burden of

22  persuasion at trial. *Id.* at 1102–03. In such cases, the nonmoving party may defeat the motion for

23  summary judgment without producing anything. *Id.* at 1103. However, if a moving party carries its

24  burden of production, the burden shifts to the nonmoving party to produce evidence showing a

25  genuine dispute of material fact for trial. *Anderson*, 477 U.S. at 248–49. Under these circumstances,

26  the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the

27  depositions, answers to interrogatories, and admissions on file, designate specific facts showing that

28  there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal

4

quotation marks omitted). If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the motion for summary judgment shall be granted. *Id.* at 322 ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co.*, 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, there must be specific, admissible evidence identifying the basis for the dispute. *See id.* "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed." FED. R. CIV. P. 56(e)(2). The Court need not "comb the record" looking for other evidence; it is only required to consider evidence set forth in the moving and opposing papers and the portions of the record cited therein. *Id.* 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." Anderson, 477 U.S. at 252.

To carry its ultimate burden of persuasion on the motion, the moving party must demonstrate that there is no genuine issue of material fact for trial. *Nissan Fire*, 210 F.3d at 1102; *Celotex Corp.*, 477 U.S. at 323.

**B.  42 U.S.C. § 1983**

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." 42 U.S.C. § 1983 ("Section 1983").

/ / /

## V.   Findings of Fact [2]

The Court finds that the following material facts are established for trial under FED. R. CIV. P. 56(a) and FED. R. CIV. P. 56(g).

On March 3, 2023, the manager of the Toyota of Lancaster car dealership called the Lancaster Sheriff's station to report a criminal threat at the dealership. DUMF ¶¶ 1, 2. The manager said that a Hispanic male had threatened to shoot several of the dealership's employees. *Id.* The manager gave a description of the suspect and the vehicle he was driving, a white Toyota Sienna van. *Id.* ¶ 3. LASD deputies responded to the call by interviewing victims and watching security videos. *Id.* ¶¶ 5, 6. The deputies learned that the suspect's vehicle was registered to an address at 1847 Sweetbrier Street in Palmdale, California. *Id.* ¶ 7. LASD Deputies Jimmy Cuoco, Eric Camacho, Marissa Gonzalez, and Ty Shelton contained the residence and called out for the suspect to exit the house. *Id.* ¶¶ 9, 10. A Hispanic man, Juan Calderon, exited the residence and was detained. *Id.* ¶ 11. As the deputies were detaining Calderon, another man, Jose Medrano, exited the residence and ran toward a nearby elementary school, Tamarisk Elementary School. *Id.* ¶ 12. Medrano was wearing a gray shirt, black pants, and black beanie with long, thick straight hair and no facial hair. *See* Ex. N at 000041; *see also* Ex. 20 (video of Medrano detained). Deputy Gonzalez saw Medrano run from the residence and believed he was the suspect from the Toyota dealership. *Id.* ¶ 13. Gonzalez then chased after Medrano. *Id.* ¶¶ 14, 15.

Deputy Shelton observed Gonzales exit her vehicle and pursue Medrano. PUMF ¶ 20. Shelton followed suit and began to pursue Medrano on foot as well. *See* DUMF ¶ 20; PUMF ¶¶ 3, 8. Gonzalez saw Medrano jump over a fence and run onto the elementary school grounds. DUMF ¶ 16.

---

[2] The facts set forth below are taken from the parties' respective Joint Statement of Uncontroverted Facts. Dkt. No. 41-2. The Court will refer to facts set forth by Defendants as "DUMF" and facts set forth by Plaintiff as "PUMF" throughout this order. To the extent that any statements of fact are omitted, the Court concludes they are not material to the disposition of this Motion. To the extent that any of the facts set below were allegedly disputed, the Court concludes that no actual dispute exists or that the adopted language resolves the dispute.

In making these Findings of Fact, the Court considered both parties' various Evidentiary Objections. Dkt. No. 41-2. The Court did not find any evidence objected to essential to finding any fact stated herein, and therefore need not reach the Evidentiary Objections.

Medrano ignored orders to surrender. *Id.* ¶ 17. Once on school grounds, Shelton and Gonzales both engaged in a pursuit of Medrano. *See id.* ¶ 21; PUMF ¶ 11. Shelton then observed Eric Rios, a Hispanic man, who was wearing a black t-shirt. DUMF ¶¶ 22, 23. Rios was a custodian at the elementary school and did not have a uniform on for his shift that day. PUMF ¶¶ 29, 31. Rios also had a full beard. *See* Ex. 19. Shelton ran towards Rios and used a take-down technique and control holds of Rios' upper body to detain Rios. *See* DUMF ¶ 25; PUMF ¶ 12. While on the ground, Rios told Shelton that he was a school custodian. DUMF ¶ 27. Gonzalez realized that Rios was not the suspect she was initially pursuing. PUMF ¶ 13. Gonzalez then went to pursue Medrano and handcuffed him. *See id.* ¶ 16. Medrano was later confirmed to be the true suspect from the dealership threats. DUMF ¶ 28. He was arrested and booked for felony criminal threats and obstructing the duties of a police officer. PUMF ¶ 4.

Rios was detained on the ground for three minutes and 50 seconds before being released once Medrano was detained and handcuffed. *See* DUMF ¶ 18, 28; Ex. 44 at 0:58-4:50. Shelton apologized to Rios. PUMF ¶ 28. When asked by the deputies immediately after the detainment, Rios refused medical treatment. DUMF ¶ 29. And in a later post-detainment interview, Rios said that he and Medrano were wearing the same shirt. *Id.* ¶ 31. Rios committed no crime on the date of the incident. PUMF ¶ 58.

## VI.    **Discussion**

Defendants move for summary judgment contending that the undisputed facts do not support Rios' claims for 1) Unreasonable Seizure/Excessive Force, 2) *Monell* Liability for i) Failure to Train and ii) Official Policy, Custom, or Practice, 3) Bane Act, 4) Negligence, 5) Assault and Battery, and 6) Intentional Infliction of Emotional Distress. For the reasons discussed below, the Court GRANTS IN PART AND DENIES IN PART summary judgment.[3]

---

[3] Plaintiff contends that Defendants' Motion for Summary Judgment should be denied because 1) Defendants reference the wrong citations to their facts, and 2) Defendants do not reference the proper legal standard and inferences for a Motion for Summary Judgment. *See* Motion at 32-33. The Court will not deny the Motion for such an error in citations, albeit it is time consuming to the Court to sort through, and the Court applies the appropriate legal standard below when deciding whether there is a genuine dispute of material fact.

The parties have two core disputes. First, the parties dispute whether Shelton's error in identifying Rios as the suspect from the dealership was reasonable: the Defendants argue that it was and Rios argues that it was not. And, according to Rios, if the error was unreasonable, no use of force was reasonable, and the Defendants are not entitled to summary judgment on their claims. Second, the parties dispute whether—even if Shelton's error in identifying Rios was reasonable—the force used against Rios was excessive: the Defendants argue that it was not and Rios argues that it was.

### A. Genuine Disputes of Material Fact Prevent the Court From Granting the Defendants Summary Judgment on the Unreasonable Seizure claim.

i. A Reasonable Jury Could find that Deputy Shelton's Error in Misidentifying Rios was Unreasonable and Therefore that the Seizure was Unreasonable and the Force Excessive.

1. *There is no genuine issue of material fact as to whether there was a seizure.*

Defendants contend that Plaintiff cannot show that "an unreasonable seizure occurred," because Shelton did not have the "requisite intentionality" for a seizure. *See* Motion at 22. Plaintiff does not directly contest that argument in the Motion, *see generally* Motion at 34-51 (noting the Bane Act intent argument did not address Defendants' cases to argue no intent for a seizure), however, the evidence proffered by Plaintiff clearly shows Rios was seized under the Fourth Amendment.

The Fourth Amendment ensures the right to be free from unreasonable seizures. U.S. Const. amend. IV. A seizure "can take the form of physical force or a show of authority that in some way restrain[s] the liberty of the person." *Torres v. Madrid*, 592 U.S. 306, 311 (2021) (internal quotations omitted). The "application of physical force to the body of a person with intent to restrain is a seizure." *Torres v. Madrid*, 592 U.S. 306, 325 (2021). "This test does not depend on either the subjective motivation of the officer or the subjective perception of the suspect." *Id.* at 307. An "objective intent to 'restrain,' for Fourth Amendment purposes, refers to measures that objectively

---

Furthermore, in its analysis below, the Court notes the genuine issues of material fact and credibility issues as it relates to the merits of the Motion. *See* Motion at 34.

1    aim to *detain* or *confine* the person, even if only temporarily or even if only through a 'mere touch.'"

2    *Puente v. City of Phoenix*, 123 F.4th 1035, 1052 (9th Cir. 2024) (quoting *Torres*, 592 U.S. at 317-18)

3    (emphasis in original).

4        Here, Shelton used physical force on Rios with the intent to restrain him. The body-worn

5    camera footage shows that Shelton tackled Rios and was on top of him to stop his movement. *See*

6    Ex. 44 at 0:58-1:26. Rios remained on the floor unable to move with Shelton standing over him for

7    three minutes and 50 seconds. *See id.* at 0:58-4:48. The Court should view the facts "in the light

8    depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381 (2007). While on the floor, Rios even

9    said that he "got slammed into the ground." *Id.* at 4:20-4:25. The written evidence also shows that

10    Shelton used physical force to restrain Rios. *See* Ex. 4 at 000052 ("I saw Deputy Shelton utilize

11    control holds of [Rios'] upper body using both of his hands.")*; see also* PUMF ¶¶ 43, 44. Therefore,

12    Shelton used "physical force to the body of a person with intent to restrain [and committed] a

13    seizure." *Torres*, 592 U.S. at 325 (holding that the officer ordering the suspect to stop and then

14    shooting to restrain her movement satisfied the objective test for a seizure).

15        Defendants contend that Shelton "had an intent to apprehend Medrano, the true suspect, but

16    accidentally took down an 'innocent bystander,'" which shows that there was no required intent for a

17    seizure. Motion at 22. However, Defendants fail to recognize the Supreme Court holding that the use

18    of any physical force to the body with the intent to restrain is a seizure. *See Torres*, 592 U.S. at 325.

19    Shelton's subjective intent on apprehending Medrano is not used to determine the intent to restrain,

20    because the test is an objective one. Unlike shooting an innocent bystander, where the police would

21    not have an objective intent to restrain the person shot because they are intending to shoot and stop

22    someone else, Shelton was objectively trying to detain Rios because he thought Rios was the

23    suspect. Motion at 22. As shown by the evidence of Shelton standing over Rios for over three

24    minutes, Shelton's use of force in applying a takedown of Rios was a measure that "objectively

25    aim[ed] to detain or confine" him. *Puente*, 123 F.4th at 1052. Therefore, Shelton committed a

26    seizure under the Fourth Amendment.

27

28

1    Accordingly, there is no genuine dispute of material fact as to whether Shelton committed a

2  seizure. The question before the Court is the reasonableness of the seizure. As discussed below, a

3  seizure based on an unreasonable misidentification is unreasonable and illegal.

4                    *2.    There are genuine disputes of material fact regarding the
                          reasonableness of Shelton's erroneous identification of Rios as the*
5                          *suspect and therefore the reasonableness of his seizure.*

6    Where an individual is erroneously detained by law enforcement based upon a

7  misidentification, that detention is illegal if the error was unreasonable. *Sharp v. County of Orange*,

8  871 F.3d 901, 910 (9th Cir. 2017).

9    The question before the Court in a case of an arrest pursuant to a warrant based upon

10  mistaken identity is "whether the arresting officers had a good faith, reasonable belief that the

11  arrestee was the subject of the warrant." *Sharp*, 871 F.3d at 910 (quoting *Rivera v. City of Los*

12  *Angeles*, 745 F.3d 384, 389 (9th Cir. 2014)). Accordingly, the question before this Court in this

13  case—which concerns a detention based upon misidentification of a suspect—is whether Deputy

14  Shelton had a good faith, reasonable belief that Rios was the suspect from the dealership.

15  "[S]ufficient probability, not certainty, is the touchstone of reasonableness under the Fourth

16  Amendment." *Hill v. California*, 401 U.S. 797, 804 (1971). The Court therefore looks to the "totality

17  of the circumstances known to the officers at the time of [the detention]" to determine the

18  detention's reasonableness. *See Vanegas v. City of Pasadena*, 46 F.4th 1159, 1164 (9th Cir. 2022).

19    In *Sharp*, the plaintiff's son was subject to an arrest warrant and was fleeing the arrest. *Sharp*

20  *v. County of Orange*, 871 F.3d 901, 905-06 (9th Cir. 2017). The suspect was described as a white

21  man wearing a black shirt and tan pants. *See id.* at 907. But the deputies arrested the plaintiff instead

22  of his son, the suspect. *See id.* at 907. Although the deputies had never seen the suspect, the Court

23  held that the deputies should have known that the plaintiff was not the suspect, because he was

24  wearing "completely different clothing," a light blue shirt and blue jeans, than the reported

25  description of the suspect's black shirt and tan pants, and the plaintiff was "walking toward them,

26  rather than fleeing like the described suspect." *Id.* at 910. Thus, the mistaken identity was held

27  unreasonable under the Fourth Amendment. *Id.* The Court rejected the defendant's defense that it

28

was nighttime and the "situation was dynamic and evolving," because "that does not give officers the license to arrest anyone near the scene of a fleeing suspect." *Id.*[4]

Defendants argue that the undisputed facts show that Deputy Shelton's error was reasonable, and they are therefore entitled to summary judgment. The Court finds that when viewing the evidence in a light most favorable to Rios, there are genuine disputes of material fact regarding the reasonableness of Shelton's mistaken belief that Rios was the suspect.

First, Defendants claim that "Deputy Shelton did not benefit from seeing Medrano before he ran from his residence onto the school grounds." Motion at 19. This may be technically true—in that Shelton did not see Medrano before he left the residence—but what is important is whether Shelton saw Medrano before or during the pursuit. The undisputed evidence shows he did. And, in fact, viewing the evidence in a light most favorable to Rios, the evidence shows that Shelton maintained constant sight of Medrano, including on school grounds.

Here is what is undisputed about the foot pursuit of Medrano: Shelton was waiting outside his patrol vehicle when he "observed a male Hispanic adult (later identified as the suspect) possibly in his late twenties to early thirties and matching the suspect description." PUMF ¶ 19. Shelton then "observed Deputy Gonzales exit her patrol vehicle and immediately pursue the suspect on foot." *Id.* 20. Shelton then put his "patrol vehicle in drive and followed Deputy Gonzales and the suspect." *Id.* 22. Shelton "observed the suspect was running with one arm moving freely," and [i]t appeared the suspect was cradling an object that [Shelton] believed was a gun." *Id.* 23. Shelton observed "Deputy Gonzales running after the suspect with roughly thirty feet between herself and the suspect." Ex. 5 at 000054. And he "observed the suspect run into a school," PUMF ¶ 24, when he "continued driving westbound toward Deputy Gonzales who was roughly two hundred and fifty feet west of [him,]" Ex. 5 at 000055. Shelton "observed the suspect running northbound through the parking lot and Deputy Gonzales not far behind him going through a gated parking lot of the school." PUMF ¶ 25. Deputy

---

[4] Defendants contend that the "danger Medrano posed, and the need for split-second decision-making in the interest of public safety" helped justify the reasonable misidentification, *see* Motion at 19-20, but that is mistaken, because of the reasons discussed above and the Ninth Circuit's rebuttal to the same defense in *Sharp.*

Gonzales was in Shelton's path of travel as he was driving into the school, *see* Ex. 5 at 000055, and he eventually hit the parking gate with his car, *id.* Shelton then proceeded into the parking lot with "both the suspect and Deputy Gonzales still in [his] view," *id.*, and Shelton stated that as he exited his car and began foot pursuit of the suspect, after picking up his body worn camera, he "did not lose visual contact of the suspect or Deputy Gonzales and was within close enough (within twenty to twenty-five feet) distance to [his] partner that if [he] had to immediately assist her … [he] would have been able to." *See* Ex 5. at 000055; PUMF ¶ 26. Shelton observed "[Rios]" running in the same path (Northeast) that the suspect was last seen," and then Shelton yelled at him. Ex. 5. at 000055.

It is therefore undisputed that Shelton saw Medrano at fairly close quarters at the beginning of the pursuit. And, when viewing the evidence in the light most favorable to Rios, the Court finds that a jury could draw a reasonable inference that Shelton therefore knew precisely what he looked like prior to entering school grounds—including that Medrano had no facial hair. During the October 2, 2025 hearing on the Motion, Defendants' Counsel asserted that Shelton could only see Medrano from the rear and there is no evidence to indicate Shelton saw Medrano from the front; however, there is enough of a factual dispute as to whether Shelton saw Medrano. And the Court finds there were some visual differences between Medrano and Rios, where Medrano was wearing a gray shirt, black pants, and black beanie with long, thick straight hair and no facial hair, while Rios claims he was wearing blue jeans, had no headwear on, was not tattooed, and had a smaller build. *See* Ex. N at 000041; Ex. 20 (video of Medrano detained); *see also* PUMF ¶ 30, 34; Ex. 41 at 3:27-3:32; Ex. E ¶ 4. It is for a jury to decide if Shelton saw Medrano, from the front or back, to properly identify these visual differences. A jury could also interpret Shelton's assertion that he "did not lose visual contact of the suspect" to mean that he had constant sight of *Medrano* throughout the pursuit, making his identification of Rios particularly unreasonable.[5] Motion at 40.

---

[5] Defendants contend that Shelton's reference to not losing visual contact of Medrano referred only to the time between the exiting of his car and when he dropped his body camera, and that when Shelton said he "observed [Rios] running in the same path (Northeast) that the suspect was last seen," see Ex. 5 at 000055 (emphasis added), the phrase "that was last seen" implied that Shelton at some point lost sight of Medrano, see Motion at 58. But that is a determination for the jury to make. Thus, at the very least, there is a genuine dispute of material fact regarding whether Shelton saw Medrano after exiting his car.

1    Second, Defendants assert that Rios, like Medrano, was running away at the time of the

2    detention. But this is disputed as well. Rios asserts that he was "standing still and facing Shelton

3    before being tackled." Ex. E ¶¶ 13-19. Rios asserts that at the time Shelton ran toward him, he

4    stopped, raised his hands in the air to make it apparent he did not have any weapons, and was facing

5    Shelton and making eye contact with him. *See* PUMF ¶¶ 42, 47, 52; *see also* Ex. 44 at 0:56-0:57. It

6    is also undisputed that after the take down Rios says "I am so glad I didn't run. I was almost gonna

7    run." Ex. 41 at 3:13-3:20. Rios's sworn statements therefore create a genuine issue of material fact

8    as to what he was doing when taken down. And the screenshots of the body-worn camera footage,

9    *see* Motion at 55-57, are not conclusive as to whether Rios was either moving or running away from

10   Shelton. Both parties are telling "two different stories," but neither of them are "blatantly

11   contradicted by the record," so a reasonable jury could believe either one of them. *Scott v. Harris*,

12   550 U.S. 372, 380 (2007). Therefore, there is a genuine dispute of material fact as to whether Rios'

13   actions distinguished him from Medrano.[6]

14       *Sharp v. County of Orange*, 871 F.3d 901 (9th Cir. 2017) supports Plaintiff's contention that

15   the mistaken identity was unreasonable in light of Shelton having observed Medrano and Rios. *See*

16   Motion at 38, 40-41

17       When viewing the facts in Rios' favor, Rios' detention and seizure was unreasonable, like in

18   *Sharp*, because Rios' appearance was notably different. Medrano was described as being a "heavily

19   tattooed male Hispanic adult, wearing a gray shirt and black pants," and also wearing gloves and a

20   black beanie or hat. *See* PUMF ¶ 1; Ex. 3 at 000046-47; Ex. 4 at 000051. But Rios claims he was

21   wearing blue Levi's jeans, was not tattooed, and that the suspect was "smaller, skinnier, and shorter"

22   than him. *See* PUMF ¶¶ 30, 34. Furthermore, Rios had an "alleged demeanor inconsistent with that

23   of a fleeing suspect," *Sharp*, 871 F.3d at 907, because Rios claims he was walking and not running

24   or fleeing the scene, *see* Motion at 41; PUMF ¶¶ 42, 47, 52; *see also* Ex. 44 at 0:56-0:57; Ex. 41 at

25   3:13-3:20. And Shelton's conduct is even more unreasonable than in *Sharp*, because while the

26

27   ───────────────

     [6] Plaintiff's contention about Rios not "making any verbal threats, acting erratically, or brandishing any
28   object," when compared to Medrano, who "verbally threatened to shoot numerous employees of a car
     dealership" is addressed in the section on excessive force. Motion at 39.

deputies in *Sharp* were operating off only a suspect description and were chasing the suspect at night, as discussed above, Shelton had actually seen the suspect and was working in the daytime. *See* PUMF ¶¶ 19-26; Ex C. at 000055. Therefore, a jury could find Shelton's mistake was unreasonable.[7]

Accordingly, the Court finds that there is a genuine dispute as to the reasonableness of the misidentification of Rios and therefore the reasonableness of the seizure.

### B. Genuine Disputes of Material Fact Prevent the Court from Granting the Defendants Summary Judgment on the Excessive Force claim.

Defendants argue that they are entitled to judgment on Plaintiff's Section 1983 claim for excessive force because (1) the use of force was objectively reasonable, and (2) even if unreasonable, Defendants are entitled to qualified immunity. Motion at 20-26.

> i. A reasonable jury—having found that the misidentification of Rios was unreasonable—could find that the force used was excessive and that there is a genuine dispute of fact as to Shelton's conduct being objectively reasonable.

The Fourth Amendment governs claims concerning a law enforcement officer's excessive use of force, whether those claims are brought under federal or state law. *Graham v. Conner*, 490 U.S. 386, 395–96 (1989); *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001) (analyzing a state law claim for battery by excessive force under the reasonableness standard of the Fourth Amendment). In evaluating a Fourth Amendment excessive force claim, the Court must evaluate "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). Whether the force used in a particular instance is objectively

---

[7] Defendants point to the body worn camera of the takedown to show that Shelton's belief was reasonable, *see* Motion at 59, but that does negate all the evidence discussed above, particularly before the takedown, to show why Shelton's belief was not reasonable. And the issue of whether Shelton used commands prior to the takedown, Motion at 38, 41, is a question of fact. *Compare* PUMF ¶ 27 (noting Shelton never used commands in the video, but the video is silent before the takedown) *with* Ex. 5 at 000055 (noting Shelton yelled "for [Rios] to stop and to get on the ground"). The issue of Shelton's use of force is examined below, because whether an arrest is unlawful and whether there is excessive force are "analytically distinct." *Sharp v. County of Orange*, 871 F.3d 901, 916 (9th Cir. 2017); Motion at 41. Furthermore, Defendants dispute the interpretation of *Sharp* by claiming that "Shelton did have a good faith belief that he had detained the appropriate suspect, as evidenced [by Defendants' arguments]," Motion at 60, but when viewing the facts in the light most favorable to Rios, Rios has analogous facts to *Sharp*.

1   reasonable requires a "careful balancing of the 'nature and quality of the intrusion on the

2   individual's Fourth Amendment interests' against the countervailing governmental interests at

3   stake." *Id.* at 396 (citation omitted).

4       To determine whether an officer's actions were objectively reasonable, the Court considers:

5   "(1) the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type

6   and amount of force inflicted, (2) the government's interest in the use of force, and (3) the balance

7   between the gravity of the intrusion on the individual and the government's need for that intrusion."

8   *Williamson v. City of National City*, 23 F.4th 1146, 1151 (9th Cir. 2022). In any event, the "heart" of

9   the *Graham* inquiry is the need for force. *Liston v. County of Riverside*, 120 F.3d 965, 976 (1997)

10  (quoting *Alexander v. City & County of San Francisco*, 29 F.3d 1355, 1367 (9th Cir. 1994)).

11      Defendants contend that the *Graham* factors "are to be applied to Medrano, not to Rios." *See*

12  Motion at 61. But the "'reasonableness'" of a particular use of force must be judged from the

13  perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."

14  *Graham*, 490 U.S. at 396. So, under the totality of the circumstances, the Court will analyze the

15  reasonableness of Shelton's force from 1) the perspective of an unreasonable misidentification of

16  Rios, and then 2) from the perspective of a reasonable misidentification. *See Mattos v. Agarano*, 661

17  F.3d 433, 441 (9th Cir. 2011) (en banc); *see also Barnes v. Felix*, 605 U.S. 73, 80 (2025) (the

18  "'totality of the circumstances' inquiry into a use of force has no time limit").

19      Moreover, because the reasonableness standard "nearly always requires a jury to sift through

20  disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many

21  occasions that summary judgment … in excessive force cases should be granted sparingly." *Torres*

22  *v. City of Madera*, 648 F.3d 1119, 1125 (9th Cir. 2011).

### a.   Type and Amount of Force

24      The Court considers the "specific factual circumstances of the case in classifying the force

25  used." *Andrews v. City of Henderson*, 35 F.4th 710, 715-16 (9th Cir. 2022). The presence of non-

26  minor physical injuries is relevant in evaluating the degree of the Fourth Amendment intrusion.

27  *Bryan v. MacPherson*, 630 F.3d 805, 824-25 (9th Cir. 2010). Force can be unreasonable even

28  without physical blows or injuries. *Id.*

1    As discussed above, the Court found that Shelton used a takedown technique and control

2    hold when detaining Rios. PUMF ¶ 12. Defendants contend that Shelton's takedown technique and

3    control hold was a "minimally invasive" level of force, objectively reasonable, and that "[Rios]

4    could still breathe, speak, and even react with a level of confusion and agitation." *See* Motion at 21-

5    23; *see also* Ex. 46 at 14-15, 17-18. Defendants further argue that "within one second, Shelton goes

6    from pursuing [Rios], to having him on his back on the ground, with his arm behind [Rios'] neck

7    supporting his head," *see* Motion at 61-62, however the video cited does not support that proposition

8    in any way. *See* Ex. 44 at 0:58-1:50. Defendants' story is "blatantly contradicted by the record, so

9    that no reasonable jury could believe it, [and thus] a court should not adopt that version of the facts."

10   *Scott v. Harris*, 550 U.S. 372, 380 (2007). Plaintiff contends that Shelton used "unnecessary,

11   inappropriate, unreasonable force and possibly deadly force when he violently 'body slammed'

12   [Rios] on to the pavement causing Great/Serious Bodily Injury even though [Rios] did not offer any

13   form of resistance." Motion at 36; *see* Ex. L at 9. Rios even stated that "the cop was like full charge

14   … [Shelton] just slammed my ass on the ground and flipped me over." *See* Ex. 19 at 1:23-1:40; *see*

15   *also* PUMF ¶ 49.[8]

16   Take-down maneuvers can be an unreasonable amount of force. *See Rice v. Morehouse*, 989

17   F.3d 1112, 1121 (9th Cir. 2021). In *Rice*, officers "executed a take-down maneuver while holding

18   [plaintiff] in a 'police lead' position; that is they tripped [plaintiff] so that he would fall to the ground

19   as they held his arms behind his back." *Id.* The plaintiff declared that this maneuver caused him to

20   fall "face-first into the pavement" and suffer "extreme pain" following his arrest. *Id.* The Ninth

21   Circuit agreed with the district court's characterization that the take-down involved a "'substantial

22   and aggressive use of force.'" *Id.* Like the defendants in *Rice*, Shelton used a take-down maneuver,

23   where Shelton wrapped his arms around Rios' body and used his body's momentum to push him to

24   the ground, which caused Rios to fall to the ground "face-first into the pavement," and Rios claims

---

[8] Plaintiff alleges that he suffered a Traumatic Brain Injury, and severe emotional injuries. PUMF ¶ 50; *see also* Ex. E ¶ 25, Dkt. No. 41-10. Defendants do not dispute this. Furthermore, Plaintiff being "assisted to a seating position so he can roll to his stomach with his arms spread," Motion at 62, does not negate the force used to allegedly body slam him to the ground in the first place.

he suffered a traumatic injury as a result. *See* Ex. 5 at 000055; Ex. 19 at 1:23-1:40; PUMF ¶ 50; Ex. 44 at 0:58-1:26.

Accordingly, when viewing the facts in the light most favorable to Rios—who contends he got body slammed into the ground via a takedown—the Court finds that the type and amount of force used was relatively severe. This does not change if the misidentification was reasonable. The Court thus "cannot say as a matter of law that a jury could not conclude that taking a passive individual to the ground with force sufficient to [seriously injure him] was excessive." *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002), *overruled on other grounds*, *Sabbe v. Washington Cnty. Bd. of Commissioners*, 84 F.4th 807, 825 (9th Cir. 2023).[9]

### b. State's Interest

Next, "[u]nder *Graham*, [the Court] evaluate[s] the state's interest at stake by considering '(1) how severe the crime at issue was, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight.'" *Rice*, 989 F.3d at 1121 (quoting *Mattos v. Agarano*, 661 F.3d 433, 443 (9th Cir. 2011) (en banc)). Among these considerations, the "most important" is the second factor—whether the suspect posed an immediate threat to officers. *Isayeva v. Sacramento Sherriff's Dep't*, 872 F.3d 938, 947 (9th Cir. 2017). These factors are non-exhaustive, and the Court examines the totality of the circumstances, including "the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *Tabares v. City of Huntington Beach*, 988 F.3d 1119, 1126 (9th Cir. 2021) (quoting *Glenn v. Washington County*, 673 F.3d 864, 872 (9th Cir. 2011)). The Court finds that when viewing the facts in favor of

---

[9] Defendants also argue that the amount of force was reasonable because Rios' "detention lasted not one moment longer than necessary." Motion at 21. Plaintiff does not contest this argument, but because the Court finds the type and amount of force in effectuating the takedown and control hold relatively severe, the issue of whether the detention's length was reasonable can go to the jury.

Rios, there is a reasonable dispute of fact as to whether the government had any interest in using force at all in this encounter.

i.  <u>There is no genuine dispute of fact regarding the severity of the crime (First Factor).</u>

Here, there is no genuine dispute regarding the severity of the Crime. As discussed above, the Court found that Rios committed no crime on the date of the incident. *See* PUMF ¶ 58; Ex. K at 9, No. 13. If a reasonable jury finds the misidentification was unreasonable, then there was no reason to think Rios committed any crime to justify force. Therefore, this factor heavily weighs against the use of any force.

ii.  <u>There is a genuine dispute of fact regarding the immediate threat to safety (Second Factor).</u>

The "most important" government interest at stake is "whether the suspect posed an immediate threat to the safety of the officers or others.'" *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc) (quoting *Smith v. City of Hemet*, 394 F.3d 589, 702 (9th Cir. 2005). If the misidentification is unreasonable, whether Rios posed an immediate threat to Shelton is a question of material fact genuinely in dispute, and thus properly reserved for the jury.

Plaintiff contends that Rios "did not pose an immediate threat to the safety of officers or third parties before, during, or after the time that Shelton tackled him." Motion at 36. Plaintiff argues there was no threat because Rios committed no crime during the incident, which is not in dispute. PUMF ¶ 58. In addition, Plaintiff argues that Rios was no threat because "[a]t the time that Shelton ran towards [Rios] at full speed, [Rios] was stopped, facing Shelton, appearing to make eye contact with Shelton, and had nothing in his hands or his waistband." *See* Motion at 36. As discussed above, whether Rios was stopped and making eye contact with Shelton as compared to either moving or running away from Shelton is a genuine issue of material fact. *See* PUMF ¶¶ 42, 47, 52; *see also* Ex. 44 at 0:56-0:57; Ex. 41 at 3:13-3:20.

Defendants argue there was an immediate threat, because it was reasonable to believe that Medrano, who "verbally threatened to shoot numerous employees of a car dealership," was "armed and evading police on the grounds of an elementary school with children around." Motion at 39, 61;

*see* Motion at 21. However, if a jury finds the misidentification was unreasonable, then a jury could find that Shelton had no reason to use the force he did against Rios, a person who posed no threat.

Furthermore, Defendants claim that Rios did not announce to Shelton that he was a custodian before contact was made or that there were any "obvious identifiers" to have signified Rios as an employee or authorized person on campus, which thus added to the threat level. *See* Motion at 20-21. But as explained above, if the misidentification was unreasonable, Rios would have posed no threat, and whether Rios identified himself to Shelton would not have changed the threat level.[10]

Accordingly, this factor weighs against finding that the government had an interest in Shelton's use of force against Rios and creates a genuine issue of material fact.

> iii.    There is a genuine dispute of fact regarding the actively resists detention or attempts to escape factor (Third Factor).

As discussed above, there is a genuine dispute of material fact concerning whether Rios resisted the deputies and was running or fleeing away from Shelton. Rios argues that he stopped and was not fleeing. *See* PUMF ¶¶ 42, 47, 52; *see also* Ex. 44 at 0:56-0:57. Defendants contest Rios' argument and claim that Rios was moving in the same direction as Medrano and was actually running away. *See* Ex. 44 at 0:54-0:57. The video evidence and screen shots produced are not conclusive. A jury may believe Rios and "might find implausible other aspects of the officers' story" or "conclude that the officer[] lied," and thus summary judgment would be improper. *See Cruz v. City of Anaheim*, 765 F.3d 1076, 1079-80 (9th Cir. 2014). Accordingly, viewing all of the evidence in the light most favorable to Rios, there is a genuine dispute of material fact as to whether Rios actively attempted to flee and thus does not weigh in favor of finding the use of force objectively reasonable.

---

[10] There is also a genuine dispute with regard to the claim of Rios not identifying himself to Shelton. In particular, the evidence cited for Defendants' assertion does not support that claim, and the body worn camera is silent—with the audio coming on right after the takedown. *See* DUMF ¶ 25; Ex. 41 at 0:18-0:25. Plaintiff also rebuts that allegation with a sworn declaration. *See* Ex. E ¶¶ 15, 17, 19, Dkt. No. 41-10.

iv.   There is a genuine dispute of fact regarding the availability of alternative methods (Fourth Factor).

Another relevant factor is the availability of alternative methods or less intrusive methods for the use of force. *See S.R. Nehad v. Browder*, 929 F.3d 1125, 1138 (9th Cir. 2019); *Scott v. Smith*, 109 F.4th 1215, 1224-25 (9th Cir. 2024). "[O]fficers need not employ the least intrusive means available so long as they act within a range of reasonable conduct. The available lesser alternatives are, however, relevant to ascertaining that reasonable range of conduct." *Glenn v. Washington County*, 673 F.3d 864, 878 (9th Cir. 2011).

Plaintiff contends that "Shelton failed to use proper de-escalation and defusing techniques during his interaction with Eric." Motion at 18. While Defendants claim that Shelton "immediately and correctly determined that cover and concealment were not readily available and contacting him [through a takedown technique] was the only manner of ensuring public safety." Motion at 21. In *Scott,* the Ninth Circuit held that the officers "ignored less intrusive alternatives to the force they employed," when the plaintiff's expert "opined that [the officers] had alternatives to bodyweight force," like using verbal de-escalation strategies or doing a "safer 'team takedown.'" *Scott v. Smith*, 109 F.4th 1215, 1225 (9th Cir. 2024). Like *Scott*, Plaintiff's expert opined that Shelton failed to use "proper de-escalation and defusing techniques during his interaction with [Rios]." *See* Ex. L at 4-5, Dkt. No. 41-12. A reasonable jury could then find that there were less intrusive means than using a takedown on Rios, especially considering the unreasonable misidentification. Thus, it was not reasonable for Shelton to use the takedown on Rios, a non-threatening person, when non-intrusive means were readily available.

Accordingly, considering all the factors, a reasonable jury could find that the government's interest in detaining Rios was minimal.

c.   *Balance of Interests*

Considering all the circumstances, a reasonable jury could conclude that Shelton's use of force was excessive. The type and amount of force used was relatively severe, no matter the misidentification. And if a jury finds that Shelton's mistake in identifying Rios was unreasonable, then it was clear Rios did not commit a crime, posed no immediate threat to the public safety, and

1  there would be a question of material fact as to Rios' attempt to flee and Shelton's use of less-

2  intrusive methods, like de-escalation techniques.

3    At bottom, "[b]ecause the [excessive force] inquiry is inherently fact specific, the

4  determination whether the force used to effect an arrest [or detainment] was reasonable under the

5  Fourth Amendment should only be taken from the jury in rare cases." *Green v. City & County of San*

6  *Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014) (citations omitted); *see also Smith v. City of Hemet*,

7  394 F.3d 589, 701 (9th Cir. 2005) ("Because [the excessive force inquiry] nearly always requires a

8  jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on

9  many occasions that summary judgment or judgment as a matter of law in excessive force cases

10 should be granted sparingly."). Although the Supreme Court has stated that "[n]ot every push or

11 shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth

12 Amendment," *Graham*, 490 U.S. at 396 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.

13 1973)), a jury could find that since the mistaken identity was unreasonable, Shelton's takedown that

14 body slammed Rios to the ground and detained him for three minutes and 50 seconds, when other

15 de-escalation techniques were available, was also objectively unreasonable. As such, "it is evident

16 that the question whether the force used here was reasonable is a matter that cannot be resolved in

17 favor of the defendants on summary judgment." *City of Hemet*, 394 F.3d at 703.

18   Given that the heart of the *Graham* inquiry is the need for force—an issue that is

19 substantially in dispute at this stage—Defendants are unable to prevail on summary judgment.

20 Therefore, Defendants' Motion is DENIED with respect to the objective reasonableness of the force

21 used and with respect to Plaintiffs' excessive force claim.

22
23     ii. <u>Defendants are not entitled to qualified immunity for the misidentification excessive use of force.</u>

24   Defendants argue that Shelton is entitled to qualified immunity because the law was not

25 clearly established to put Shelton on notice of the unreasonableness of the mistaken identity seizure

26 and the excessive use of force. *See* Motion at 24-25, 63-65. The Court finds that the law was clearly

27 established in regard to the unreasonableness of 1) the mistaken identity seizure, and 2) the use of

28 force for the takedown.

1    In resolving a claim of qualified immunity, courts are required to undertake a two-step

2    inquiry that considers (1) whether, taken in the light most favorable to the plaintiff, the defendant's

3    conduct violated a constitutional right; and if so, (2) whether that right was clearly established.

4    *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Courts have the discretion to address the two-step inquiry

5    in the order they deem most suitable under the circumstances and may address directly whether the

6    right at issue was clearly established rather than first determining whether an actual constitutional

7    violation occurred. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). The analysis must assume

8    facts in the light most favorable to the injured party. *Katz*, 533 U.S. at 201. Thus, taken altogether,

9    defendants are "only entitled to qualified immunity as a matter of law if, taking the light most

10   favorable to [Plaintiffs], they violated no clearly established constitutional right." *Torres v. City of*

11   *Los Angeles*, 548 F.3d 1197, 1210 (9th Cir. 2008) (citing *Hunter v. Bryant*, 502 U.S. 224, (1991)).

12   A right is clearly established for purposes of qualified immunity only where "[t]he contours

13   of the right [are] sufficiently clear that a reasonable official would understand that what he is doing

14   violates that right." *Dunn v. Castro*, 621 F.3d 1196, 1200 (9th Cir. 2010) (quoting *Anderson v.*

15   *Creighton*, 483 U.S. 635, 640 (1987)). For a constitutional right to be clearly established, a court

16   must define the right at issue with "specificity" and "not . . . 'at a high level of generality.'" *City of*

17   *Escondido, Cal. v. Emmons*, 586 U.S. 38, 42 (2019). A clearly established right cannot merely be

18   implied by precedent, and plaintiffs may not defeat qualified immunity by describing violations of

19   clearly established general or abstract rights outside "an obvious case." *White v. Pauly*, 580 U.S. 73,

20   79, 80 (2017) (internal quotation marks and citations omitted). While the clearly established law

21   must be "particularized" to the facts of the case, *id.* at 79, a plaintiff need not point to circumstances

22   where "the very action in question has previously been held unlawful." *Anderson*, 483 U.S. at 640;

23   *see also Perez v. City of Fresno*, 98 F.4th 919, 924 (9th Cir. 2024) ("Although there need not be a

24   case directly on point, existing precedent must have placed the statutory or constitutional question

25   beyond debate.") (internal quotation marks and citations omitted). In fact, "officials can still be on

26   notice that their conduct violates clearly established law even in novel factual circumstances." *Hope*

27   *v. Pelzer*, 536 U.S. 730, 741 (2002). Thus, the question is not whether an earlier case mirrors the

28   specific facts here. Rather, the relevant question is whether the state of the law at the time gives

1   officials fair warning that their conduct is unconstitutional." *Ellins v. City of Sierra Madre*, 710 F.3d

2   1049, 1064 (9th Cir. 2013) (citation omitted).

3          The plaintiff "bears the burden of showing that the rights allegedly violated were clearly

4   established." *Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017). "[S]ummary

5   judgment in favor of moving defendants is inappropriate where a genuine issue of material fact

6   prevents a determination of qualified immunity until after trial on the merits." *Est. of Lopez ex rel.*

7   *Lopez v. Gelhaus*, 871 F.3d 998, 1021 (9th Cir. 2017) (internal citations omitted).

8          Here, when viewing the facts in favor of Rios, a reasonable jury could find Rios' Fourth

9   Amendment rights were violated because the mistaken identity seizure on Rios was unreasonable,

10  and the amount of force applied to Rios with the take-down was excessive, in light of the

11  unreasonableness of the mistaken identity. Thus, the Court must determine whether the Defendants

12  violated clearly established law as to both 1) the mistaken identity seizure and 2) the use of force

13  take-down.

14         Plaintiff argues that *Sharp v. County of Orange*, 871 F.3d 901 (9th Cir. 2017) ("*Sharp*") put

15  Defendants on notice that their mistaken seizure of Rios was unconstitutional. *See* Motion at 43-44.

16  Defendants claim that *Sharp*, a "mistaken identi[ty] case similar to the one at hand" did not clearly

17  establish the law because the Court in *Sharp* held that the reasonableness of the mistaken identity

18  seizure was not clearly established at the time of *Sharp*. *See* Motion at 25-26. The Court finds that

19  *Sharp* did put Defendants on notice that their mistaken identity seizure of Rios was unconstitutional

20  since the events of Rios' detainment happened years after *Sharp* was published.

21         As previously stated, the facts in *Sharp* are directly analogous. In *Sharp*, the plaintiff's son,

22  who was subject to an arrest warrant, was fleeing the arrest. *Sharp*, 871 F.3d at 905-06. The suspect

23  was described as a white man wearing a black shirt and tan pants, and the deputies knew the suspect

24  generally may have been in the area of his house. *See id.* at 907. The deputies had "enough light" to

25  approximate the plaintiff's age, which was much older than the suspect's. *See id*. The plaintiff had

26  "mismatched clothing and an alleged demeanor inconsistent with that of a fleeing suspect." *Id.* But

27  the deputies arrested the plaintiff instead of his son, the suspect. *See id.* at 907. Although the

28  deputies had never seen the suspect and were just trying to detain everyone coming out of the house,

the Court held that the deputies should have known that the plaintiff was not the suspect, because he was wearing "completely different clothing," a light blue shirt and blue jeans, than the reported description of the suspect's black shirt and tan pants, and the plaintiff was "walking toward them, rather than fleeing like the described suspect." *Id.* at 910. Thus, the mistaken identity was held unreasonable in violation of the Fourth Amendment. *Id.* The Court rebutted the defendant's defense that it was nighttime and the "situation was dynamic and evolving," because "that does not give officers the license to arrest anyone near the scene of a fleeing suspect." *Id.*

Like the plaintiff and suspect in *Sharp*, Rios and Medrano were described as having "completely different clothing" and appearance. Medrano was described as a heavily tattooed man wearing a gray shirt, black pants, gloves, and a black beanie or hat. *See* PUMF ¶ 1; Ex. 3 at 000046-47; Ex. 4 at 000051. Rios did not look like the suspect because he was not tattooed, not wearing a hat or beanie, and was wearing blue jeans. And Medrano was described as a fleeing suspect, like the real suspect in *Sharp*, while Rios had an "alleged demeanor inconsistent with that of a fleeing suspect" because Rios was not fleeing from Shelton. *See* PUMF ¶¶ 42, 47, 52; *see also* Ex. 44 at 0:56-0:57; Ex. 41 at 3:13-3:20. And Shelton saw Medrano, making the misidentification more unreasonable. Therefore, a jury could find the mistaken identity unreasonable, and *Sharp* clearly established Rios' constitutional rights against unreasonable mistaken identities and unreasonable seizures under the Fourth Amendment.

To the extent Defendants contest these facts to argue the reasonableness of Rios' seizure and rebut the clearly established law in *Sharp*, summary judgment is not proper. The "answer to that [reasonableness of mistaken identity] question depends on disputed issues of material fact … best resolved by a jury." *Wilkins v. City of Oakland*, 350 F.3d 949, 955 (9th Cir. 2003). Thus, "the officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, [making] summary judgment [] not appropriate." *Id.* at 956.

Plaintiff then argues that "[if] the amount of force used in *Sharp* was unconstitutional, then clearly using even more force, as used here, is also unconstitutional under case precedent." Motion at 44. The Court finds that *Sharp* did not put Defendants on notice that the use of force was excessive,

*see* Motion at 63-65, because *Sharp* did not hold that the use of force in question by the officers was unreasonable and clearly established, *see Sharp,* 871 F.3d at 917. Plaintiff also cites to out-of-circuit cases to argue that it is "clearly established to a reasonable officer that an officer may not use force on an unarmed person who is not fleeing or evading or obstructing arrest." *See* Motion at 44-46. The Court looks to Ninth Circuit precedent and finds that it clearly establishes the unreasonableness of Shelton's use of force.

In *Andrews v. City of Henderson,* the Ninth Circuit held that it was clearly established that the Fourth Amendment prohibits officers from "tackling a 'relatively calm' suspect without providing any warning where the suspect is not posing an immediate danger to anyone, resisting arrest, or trying to flee unless the officers first attempt a less intrusive means of arrest." 35 F.4th 710, 720 (9th Cir. 2022); *see also Blankenhorn v. City of Orange,* 485 F.3d 463, 481 (9th Cir. 2007). In *Andrews*, the officers "forcibly tackled [the plaintiff] to the ground with enough force to fracture his hip." *Andrews*, 35 F.4th at 716. There was no dispute that the plaintiff was "not resisting arrest or attempting to flee," that the officers could have used less intrusive means than tackling the plaintiff, and that the officers did not give warnings before tackling the plaintiff. *See id.* at 717. Like the plaintiff in *Andrews,* when viewing the facts most favorable to Rios, Shelton forcibly tackled Rios to the ground with enough force to cause a Traumatic Brain Injury, Rios was not fleeing or resisting arrest, Shelton could have used less-intrusive de-escalation techniques over the take-down, and Shelton did not give warnings before tackling Rios. *See* PUMF ¶¶ 27, 42, 44, 47, 50, 52; *see also* Ex. 44 at 0:56-0:57; Ex. 41 at 3:13-3:20; Ex. E ¶ 25, Dkt. No. 41-10; Ex. 19 at 1:23-1:40; Ex. L at 4-5, 9.

Furthermore, in *Rice*, it was clearly established that the takedown that caused the plaintiff to fall "face-first into the pavement" and suffer "extreme pain" following his arrest, despite the plaintiff "not resisting in any way," was unconstitutional. *Rice*, 989 F.3d at 1121, 1123, 1125-27.  The Ninth Circuit held that there is a "body of relevant case law" that placed the defendant's "use of substantial force against a passively resisting person 'beyond debate.'" *Id.* at 1126; *see also Nelson v. City of Davis,* 685 F.3d 867, 881 (9th Cir. 2012) ("[The Ninth Circuit has] recognized that a failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force."). As discussed above, when viewing the

facts most favorable to Rios, the takedown in *Rice* was factually analogous to Rios', and Rios was not fleeing or resisting arrest, or engaging in more than passive resistance, if it could even be deemed that. Thus, under Ninth Circuit precedent, Shelton's use of force was excessive and violated Rios' clearly established Fourth Amendment rights.

> iii.    Even if a reasonable jury finds the misidentification of Rios was reasonable, it could still find that the force used was excessive and that there is a genuine dispute of fact as to Shelton's conduct being objectively reasonable.

Because the Court has found that genuine disputes of material fact prevent this Court from granting summary judgment in favor of the Defendants on the reasonableness of the misidentification, the Court as discussed above finds that genuine disputes of material fact prevent this Court from granting summary judgment in favor of the Defendants on the reasonableness of the seizure or the reasonableness of the force used. The Court therefore need not consider the question of the reasonableness of the force used if the misidentification was reasonable. But because the Defendants have asked for partial summary judgment and because Rios himself argues that the force was excessive even if the misidentification was reasonable, the Court will address this question as well.

A reasonable jury could find that Shelton's use of force was objectively unreasonable, even if they find the misidentification to be reasonable, because there are still questions of fact surrounding the threat to public safety, Rios' attempt to flee, and Shelton's use of less intrusive methods. *See Graham*, 490 U.S. at 397; *Williamson*, 23 F.4th at 1151.

First, the type and amount of force used on Rios would still be the same, and thus relatively severe as discussed above. And there would also be no genuine dispute regarding the severity of the crime, because the Court found that Defendants were responding to a felony criminal threat allegation, and that Medrano was later arrested and booked for committing the felony criminal threats. *See* DUMF ¶¶ 2, 13; PUMF ¶¶ 4, 10. So, if Shelton reasonably thought Rios was Medrano, then he had a reasonable belief to think the crime was severe. Accordingly, the severity-of-the-crime factor would weigh in favor of the use of force.

However, there are still genuine disputes of material fact as to the immediate threat to public safety and to Rios' attempt to flee, even if Shelton reasonably mistook Rios for Medrano. Rios did

not pose an immediate threat to safety, because Rios committed no crime. PUMF ¶ 58. But Defendants argue that there was an immediate threat, because it was reasonable to believe that Medrano, who "verbally threatened to shoot numerous employees of a car dealership," was "armed and evading police on the grounds of an elementary school with children around." Motion at 39, 61; *see* Motion at 21. And because the mistaken identity was reasonable, Shelton had either probable cause or reasonable suspicion to detain Medrano and thus detain Rios. *See* Motion at 20-21. Defendants also argue that the "split-second decision" was informed by Rios not announcing to Shelton that he was a custodian before contact was made or that there were any "obvious identifiers" to have signified Rios as an employee or authorized person on campus, which thus added to the threat level. *See id.*

It is undisputed that an armed suspect evading police on the grounds of an elementary school is a threat, and Rios acknowledged that Shelton was in the heat of the moment and scared. *See* Ex. 19 at 3:52-4:09. However, as discussed above, whether Rios was "evading police" and running away from Shelton as opposed to being stopped and making eye contact with Shelton is a genuine issue of material fact. *See* PUMF ¶¶ 42, 47, 52; *see also* Ex. 44 at 0:54-0:57; Ex. 41 at 3:13-3:20. And whether Rios identified himself to Shelton is likewise a question of fact. *See* DUMF ¶ 25; Ex. 41 at 0:18-0:25 (noting the body worn camera is silent. with the audio coming on right after the takedown); *see also* Ex. E ¶¶ 15, 17, 19, Dkt. No. 41-10. So, because there is a genuine dispute of material fact as to whether Rios actively attempted to flee and identified himself when viewing the facts in Rios' favor, there is likewise a disputed question of whether there was an immediate threat to public safety. Accordingly, the threat and fleeing factors weigh against finding that the use of force was objectively reasonable and against finding that the government had an interest in Shelton's use of force against Rios.

Furthermore, even if Shelton reasonably thought he was Medrano, he still could have used de-escalation and defusing techniques. Plaintiff's expert opined that "law enforcement officers are taught that they should attempt to de-escalate and utilize proper defusing techniques throughout an incident," but Shelton failed to use those techniques during his interaction with Rios. *See* Ex. L at 4-5, Dkt. No. 41-12. These proper de-escalation techniques that were taught to Shelton would have

applied when apprehending Medrano or any suspect because they are LASD procedures. *See id.* at 5. Therefore, a reasonable jury could find that there were less intrusive means than using a takedown on Rios, even if the misidentification was reasonable.[11]

Balancing all the factors, a reasonable jury could still conclude that Shelton's use of force on Rios was excessive, even with a reasonable misidentification, because of the multiple disputed questions of material factor surrounding the need for force. Thus, Defendants are unable to prevail on summary judgment and Defendants' Motion is DENIED with respect to Plaintiffs' excessive force claim.

  iv. <u>Defendants are not entitled to qualified immunity for a reasonable misidentification excessive use of force.</u>

Even if the misidentification was reasonable, Defendants would still be aware that they violated clearly established law with respect to their excessive use of force on Rios. It was clearly established that the Fourth Amendment prohibits officers from "tackling a 'relatively calm' suspect without providing any warning where the suspect is not posing an immediate danger to anyone, resisting arrest, or trying to flee unless the officers first attempt a less intrusive means of arrest." 35 F.4th at 720. As explained above, even if Shelton reasonably thought Rios was Medrano, Rios was still not fleeing or resisting arrest, Shelton could have used less-intrusive de-escalation techniques over the take-down, and Shelton did not give warnings before tackling Rios to the ground. *See* PUMF ¶¶ 27, 42, 44, 47, 50, 52; *see also* Ex. 44 at 0:56-0:57; Ex. 41 at 3:13-3:20; Ex. E ¶ 25, Dkt. No. 41-10; Ex. 19 at 1:23-1:40; Ex. L at 4-5, 9. And even if Shelton reasonably believed Rios was fleeing, he was at best passively resisting, and the Ninth Circuit held that there is a "body of relevant case law" that placed the defendant's "use of substantial force against a passively resisting person 'beyond debate.'" *Rice*, 989 F.3d at 1126; *see also* Nelson, 685 F.3d at 881. Therefore, under Ninth Circuit precedent, Shelton's use of force was excessive and violated Rios' clearly established Fourth

---

[11] During the October 2, 2025 hearing on the Motion, Defendants' Counsel asserted that their expert report found that given Medrano's threat, it was unreasonable for Shelton to implement tradition de-escalation tactics before the takedown of Rios, *see* Ex. 46 at 15-17, but as discussed above, Plaintiff's expert report notes that Shelton knew to use de-escalation techniques and failed to do so. Thus, there is still a question of fact with regards to less intrusive methods for the use of force.

Amendment rights, no matter if the misidentification was reasonable. Defendants' Motion is thus DENIED with respect to their qualified immunity defense.

### C. There are No Genuine Disputes of Material Fact as to Plaintiff's *Monell* claims.

Defendants argue that it is entitled to summary judgment on Plaintiff's *Monell* claims for (1) unconstitutional custom, practice, or policy, (2) failure to train, and (3) ratification. Motion at 30-31.

"A government entity may not be held liable under 42 U.S.C. § 1983, unless a policy, practice, or custom of the entity can be shown to be a moving force behind a violation of constitutional rights." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citing *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 (1978)). "In order to establish liability for governmental entities under *Monell*, a plaintiff must prove '(1) that [the plaintiff] possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and, (4) that the policy is the moving force behind the constitutional violation.'" *Id.* (citation omitted).

A plaintiff may establish *Monell* municipal liability under Section 1983 even where the municipality does not expressly adopt the alleged policy. *See Webb v. Sloan*, 330 F.3d 1158, 1164 (9th Cir. 2003). There are three alternative ways such liability can attach: (1) "if an employee commits a constitutional violation pursuant to a longstanding practice or custom;" (2) "when the person causing the violation has final policymaking authority," *id.*, and "the authorized policymakers approve[d] [and ratified] a subordinate's decision and the basis for it," *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988); and (3) "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). "[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). Rather, the plaintiff must "demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Id.*

Here, Plaintiff contends that the County of Los Angeles ("the County") and Los Angeles Sheriff's Department ("LASD") is liable under *Monell* because they "were on notice three years before this Incident about Shelton's propensity to use excessive force," and thus (1) had an

unconstitutional "official policy, custom, or practice of failing to investigate repeated constitutional violations, and of failing to punish officers for unlawful conduct," (2) "failed to train Shelton and discipline him for his conduct," and (3) had a policymaker that ratified Shelton's decision-making *See* Motion at 46-47.

        i.  <u>There is no genuine dispute as to whether the County's and LASD's policy, custom, or practice of investigating and punishing officers is unconstitutional.</u>

A party may establish municipal liability by demonstrating "the constitutional tort was the result of a 'longstanding practice or custom which constitutes the standard operating procedure of the local government entity.'" *Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008) (quoting *Ulrich v. City & County of San Francisco*, 308 F.3d 968, 984-85 (9th Cir. 2002)). The policy "must be a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Benavidez v. County of San Diego*, 993 F.3d 1134, 1153 (9th Cir. 2021) (citation omitted); *see City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985). Under this theory, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *Tuttle*, 471 U.S. at 823–24. However, a custom or practice can be "inferred from widespread practices or evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded." *Hunter v. County of Sacramento*, 652 F.3d 1225, 1233 (9th Cir. 2011) (internal quotations omitted).

Here, Plaintiff does not create a genuine issue of material fact as to whether the County's and LASD's custom, policy, or practice of failing to investigate repeated constitutional violations and failing to punish officers for unlawful conduct led to an unconstitutional violation of excessive force under the Fourth Amendment against Rios.

Plaintiff argues there is a general custom, policy, or practice of failing to investigate repeated constitutional violations for excessive use of force by directly pointing to two lawsuits against Shelton for use of either excessive force or excessive deadly force. *See* Motion at 46-47. The events

in the first Shelton lawsuit happened three years prior to the force in question on Rios, and the events in the second Shelton lawsuit happened nine months after the force in question on Rios. *See id.* Thus, the Court will only look to the evidence of the first lawsuit that took place before Rios' event to determine if there was evidence of "repeated constitutional violations" to infer a custom, policy, or practice of failing to investigate. Furthermore, the Court also looks to Plaintiff's expert report, which alludes to the County's and LASD's policy on detainment and excessive force, but it does not allege any policy, custom, or practice of investigations or punishment for officers. *See generally* Ex. L, Dkt. No. 41-12. Plaintiff's Expert Report does mention how Shelton "failed to use proper de-escalation techniques during his interactions with [Rios]," and that a "reasonable Deputy Sheriff acting consistent with standard police practices would not have detained [Rios]" or "used any force on [Rios]," but there is nothing about how the County's and LASD's policy, custom, or practice of failing to investigate shows a "deliberate indifference to [Rios'] constitutional right" and how it was "the moving force behind the constitutional violation." *See id.* at 4, 6, 9. This evidence does not establish that the County and LASD had an unconstitutional policy, custom, or practice of failing to investigate or condone excessive use of force that cause Rios' harm.

As such, Defendants Motion is GRANTED with respect to Plaintiff's *Monell* claim for an unconstitutional policy, custom, or practice.[12]

> ii.  There is no genuine dispute of material fact as to whether the County's and
> LASD's failure to train was deliberately indifferent.

"[A] local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of 1983," but "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). To demonstrate such inadequacy, Plaintiffs must show that the County's failure to train "amounts to deliberate

---

[12] The Court need not address Shelton's level of composure and professionalism as it relates to LASD's policies, *see* Motion at 21, because there was no *Monell* violation as to any County and LASD policy.

indifference to the rights of the persons with whom [untrained employees] come into contact," which is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his actions." *Id.* (citations omitted). Deliberate indifference exists when the need for "more or different" action is "so obvious, and the inadequacy [of existing practice] so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Park v. City and County of Honolulu*, 952 F.3d 1136, 1141 (9th Cir. 2020) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989)). A plaintiff can meet this standard one of two ways. Under the first option, "the unconstitutional consequences of failing to train must be patently obvious and the violation of a protected right must be a highly predictable consequence of the decision not to train." *Kirkpatrick v. County of Washoe*, 843 F.3d 784, 794 (9th Cir. 2016) (citations omitted). Though generally insufficient, a single instance of a constitutional violation may support a finding of patent obviousness. *See Benavidez*, 993 F.3d at 1154. However, these cases are rare. *See Kirkpatrick*, 843 F.3d at 794. "Alternatively, if the policy is not obviously, facially deficient, a plaintiff must ordinarily point to a pattern of prior, similar violations of federally protected rights, of which the relevant policymakers had actual or constructive notice." *Park*, 952 F.3d at 1142. Nonetheless, "[w]hether a local government has displayed a policy of deliberate indifference to the constitutional rights of its citizens is generally a jury question." *Long v. County of Los Angeles*, 442 F.3d 1178, 1190-91 (9th Cir. 2006).

Here, as explained above, Plaintiff argues a pattern of similar constitutional violations for excessive use of force by directly pointing to two lawsuits against Shelton for use of either excessive force or excessive deadly force. *See* Motion at 46-47. The events in the first Shelton lawsuit happened three years prior to the force in question on Rios, and the events in the second Shelton lawsuit happened nine months after the force in question on Rios. *See id.* Thus, the Court will only look to the evidence of the first lawsuit that took place before Rios' event to determine if the violation of Rios' rights was patently obvious due to a failure to train Shelton.

Plaintiff did not meet his initial burden to show that the County failed to train Shelton and that such failure was deliberately indifferent to Rios' rights. Even if the need for training was "so obvious," *see Park*, 952 F.3d at 1141, because of Shelton's prior use of excessive deadly force,

where "Shelton shot and killed a 61-year old disabled African-American man in his own home," *see* Motion at 26, Plaintiff still had the burden in the Motion to establish that the County failed to train Shelton. Plaintiff did not point to any evidence in the record to meet that burden. And Plaintiff cannot now, as discussed at the Motion hearing, point to the yearly reports by the monitoring team on the status of training (or lack thereof) for all Deputies in the Antelope Valley to show a specific failure to train Shelton. None of Plaintiff's documents in the RJN show specifically, in regards to Shelton, that "whatever training Deputy Shelton may have received between June 11, 2020 and March 3, 2023, was inadequate and counterproductive." *See* RJN at 2. Therefore, Defendants' Motion is GRANTED with respect to Plaintiffs' *Monell* claim for failure to train.

        iii.   <u>There is no genuine dispute of material fact as to whether a County or LASD policymaker ratified Shelton's conduct.</u>

To succeed on a *Monell* claim for ratification, a plaintiff first must identify the policymaker and show that that person possessed final policymaking authority for the County. *See Pembaur v. Cincinnati*, 475 U.S. 469, 481 (1986). The plaintiff must then show that "the authorized policymaker[] approve[d] a subordinate's decision and the basis for it, [thus] their ratification would be chargeable to the municipality because their decision is final." *City of St. Louis*, 485 U.S. at 127.

The Court finds that there Plaintiff did not "point to any relevant policymaker related to the policies at issue." *See* Motion at 31-32. Plaintiff's Expert Report mentions how Shelton "failed to use proper de-escalation techniques during his interactions with [Rios]," and that a "reasonable Deputy Sheriff acting consistent with standard police practices would not have detained [Rios]" or "used any force on [Rios]," but there is nothing about how a policymaker of the County and LASD ratified Shelton's decisions. *See* Ex. L at 4, 6, 9, Dkt. No. 41-12. Therefore, Plaintiff cannot create a genuine dispute of material fact as to their ratification claim.

**D.  There is a Genuine Issue of Material Fact as to Plaintiff's Bane Act claim.**

Defendants next argue that summary judgment is proper with respect to Plaintiff's Bane Act claim, because Plaintiff presents no evidence that Shelton had the specific intent to violate Rios' constitutional rights, intended to use more force than necessary when carrying out the contact and detainment, or otherwise recklessly disregarded Plaintiff's rights. Motion at 29.

The Bane Act permits a claim against "a person or persons, whether or not acting under color of law, [who] interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of [California]." CAL. CIV. CODE § 52.1(a)–(c). "The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., 'threats, intimidation or coercion'), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law." *Austin B. v. Escondido Union Sch. Dist.*, 57 Cal. Rptr. 3d 454, 472 (Cal. Ct. App. 2007).

A Bane Act violation occurs when (1) the defendant interferes with the plaintiff's constitutional or statutory right by threatening or committing violent acts, (2) the plaintiff reasonably believed that if he exercised his constitutional right, the defendant would commit violence against him, or the defendant injured the plaintiff to prevent him from exercising his constitutional right, (3) the plaintiff was harmed, and (4) the defendant's conduct was a substantial factor in causing the plaintiff's harm. *Austin B.*, 57 Cal. Rptr. 3d at 471. Moreover, in the context of a Fourth Amendment excessive force claim, the Bane Act requires a showing of "specific intent to violate the arrestee's right to freedom from unreasonable seizure." *Reese v. County of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018) (citing *Cornell v. City & County of San Francisco*, 225 Cal. Rptr. 3d 356, 382-85 (Ct. App. 2017)).

Specific intent for the purposes of a Bane Act claim can be established with evidence of a defendant's reckless disregard for a person's constitutional rights. *Reese*, 888 F.3d at 1045; *see also Cornell*, 225 Cal. Rptr. 3d at 385-86 ("[S]pecific intent" may be shown by demonstrating that the defendant "acted … 'in reckless disregard of constitutional or statutory prohibitions or guarantees.'"). Determining specific intent is a two-part analysis. "The first is a purely legal determination. Is the . . . right at issue clearly delineated and plainly applicable under the circumstances of the case?" *Cornell*, 225 Cal. Rptr. 3d at 386 (quoting *People v. Lashley*, 2 Cal. Rptr. 2d 629, 635 (Cal. Ct. App. 1991)). "If the trial judge concludes that it is, then the jury must make the second, factual, determination. Did the defendant commit the act in question with the

particular purpose of depriving the citizen victim of his enjoyment of the interests protected by that . . . right?" *Id.*

First, the Fourth Amendment rights against mistaken arrest/detention and excessive force were clearly delineated and plainly applicable under the circumstances of this case. *See Andrews*, 35 F.4th at 720; *Rice,* 989 F.3d at 1125-27; *Sharp,* 871 F.3d at 910.

Next, given all of the factual disputes concerning Shelton's actions that day, a genuine factual dispute remains with respect to whether Shelton had the specific intent to violate Rios' Fourth Amendment rights. Thus, a reasonable jury could determine that the misidentification of Rios for Medrano, the amount of force used, and the nature of the force used by Shelton was circumstantial evidence of the "reckless disregard" for Rios' constitutional rights and thus the specific intent needed.[13]

As such, Defendants' Motion is DENIED with respect to Plaintiff's Bane Act claim.

### E. There is a Genuine Dispute of Material Fact as to whether Defendants were Negligent.

Defendants next argue that they are entitled to summary judgment on Plaintiff's negligence claim because (1) there is no triable issue as to whether Shelton's use of force was reasonable, (2) there is no triable issue as to whether Shelton's misidentification of Rios was reasonable, and (3) Shelton is immune under California Government Code section 820.2. Motion at 28-29.

Under California negligence law, "a plaintiff must show that the defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury." *Hayes v. County of San Diego*, 305 P.3d 252, 255 (Cal. 2013). Peace officers have a duty to act reasonably when using force. *Id.* The reasonableness of an officer's conduct, including pre-force conduct, is determined under the totality of the circumstances. *Id.* at 629, 632. However, "California negligence law overall is broader than federal Fourth Amendment law in excessive force

---

[13] Another court in this district has taken a similar approach with respect to this question. In *Vos v. City of Newport Beach*, No. SACV 15000768 JVS (DFMs), 2020 WL 4333656, at *10 (C.D. Cal. June 8, 2020), the court denied defendant officers' summary judgment on a Bane Act claim where plaintiffs presented circumstantial evidence of officers' specific intent to deprive plaintiffs of their constitutional rights.

1  cases." *Tabares v. City of Huntington Beach*, 988 F.3d 1119, 1128 (9th Cir. 2021) (quoting *Villegas*

2  *ex rel. C.V. v. City of Anaheim*, 823 F.3d 1252, 1257 n.6 (9th Cir. 2016)). Accordingly, "[a]s long as

3  an officer's conduct falls within the range of conduct that is reasonable under the circumstances,

4  there is no requirement that he or she choose the most reasonable action or the conduct that is the

5  least likely to cause harm and at the same time the most likely to result in the successful

6  apprehension of a violent suspect, in order to avoid liability for negligence." *Hayes*, 305 P.3d at 258

7  (quoting *Brown v. Ranseiler*, 89 Cal. Rptr. 3d 801, 820 (Cal. Ct. App. 2009)). In any event,

8  "[s]ummary judgment is appropriate when the trial court determines that, viewing the facts most

9  favorably to the plaintiff, no reasonable juror could find negligence." *Id.*

10          Here, because genuine issues of material fact exist as to the reasonableness of Shelton's

11  seizure-related misidentification of Rios and to the reasonableness of Shelton's excessive use of

12  force on Rios under the Fourth Amendment, summary judgment for Defendants is similarly

13  inappropriate on Plaintiff's negligence claim. Both Fourth Amendment excessive force and state law

14  negligence claims analyze the use of force under the totality of the circumstances. Since a reasonable

15  juror could determine that it was unreasonable under the totality of the circumstances to body slam

16  Rios, who was not fleeing or running away, and then detain him on the ground for several minutes,

17  Defendants cannot prevail on summary judgment with respect to Plaintiff's negligence claim. *See*

18  *S.R. Nehad v. Browder*, 929 F.3d 1125, 1142 (9th Cir. 2019) (reversing district court's grant of

19  summary judgment for defendant officer on negligence claim where objective reasonableness of

20  officer's use of force was a disputed issue of fact).

21          Defendants' argument that Shelton is immune under California Government Code § 820.2,

22  which provides that a public employee "is not liable for an injury resulting from his act or omission

23  where the act or omission was the result of the exercise of the discretion vested in him" is

24  unavailing. CAL. GOV'T. CODE § 820.2. Section 820.2 liability does not apply to the "decision to

25  arrest … [because it is] not a basic policy decision, but only an operational decision by the police

26  purporting to apply the law." *Gillan v. City of San Marino*, 55 Cal. Rptr. 3d 158, 174 (Cal. Ct. App.

27  2007), *disapproved of on other grounds*, 530 P.3d 1093 (Cal. 2023); *see also Conway v. County of*

28  *Tuolumne,* 180 Cal. Rptr. 3d 598, 605 (Cal. Ct. App. 2014) (noting § 820.2 immunity does not apply

to decisions to arrest an individual when there was no probable cause to do so). Moreover, § 820.2 immunity is inapplicable where excessive force is used in making an arrest. *See Scruggs v. Haynes*, 60 Cal. Rptr. 355, 360 (Cal. Ct. App. 1967); *see also Blankenhorn v. City of Orange,* 485 F.3d 463, 487 (9th Cir. 2007). Because there is a genuine issue of material fact as to the reasonableness of the seizure and to the reasonableness of the force used for the detainment, Defendants are not entitled to this statutory immunity.[14]

As such, Defendants' Motion is DENIED as to Plaintiff's negligence claim.

### F. There is a Genuine Dispute of Material Fact as to whether Defendants Committed Assault and Battery.

Defendants also move for summary judgment on Rios' claim of assault and battery. As against a police officer, assault and battery claims requires a showing of unreasonable force. *Edson v. City of Anaheim*, 74 Cal. Rptr. 2d 614, 615 (Cal. Ct. App. 1998); *Nelson v. City of Davis*, 709 F. Supp. 2d 978, 992 (E.D. Cal. Apr. 29, 2010), *aff'd*, 685 F.3d 867 (9th Cir. 2012) ("Because the same standards apply to both state law assault and battery and Section 1983 claims premised on constitutionally prohibited excessive force, the fact that Plaintiff's 1983 claims under the Fourth Amendment survive summary judgment also mandate that the assault and battery claims similarly survive."). As analyzed above, the Court finds a genuine issue of material fact as to the reasonableness of Shelton's use of force against Rios. *See Hill v. City of Fountain Valley*, 70 F.4th 507, 519 (9th Cir. 2023) (treating Section 1983 and state law assault and battery claims similarly). Thus, the Court DENIES summary judgment as to the assault and battery claim.

### G. There is a Genuine Dispute of Material Fact regarding Plaintiff's Intentional Infliction of Emotional Distress claim.

---

[14] Defendants cite to *Conway v. County of Tuolumne*, 180 Cal. Rptr. 3d 598 (Cal. Ct. App. 2014) to argue that § 820.2 immunity extends to "whether or not to use force in the field," *see* Motion at 28, but the issue in *Conway* is the "selection of the means used to effectuate an arrest," *id.* at 606, which is not at issue in this case. Here, this case concerns the decision to detain Rios and the excessive force used in making that detainment, which is not immune under section 820.2 as discussed above. *See Conway*, 180 Cal. Rptr. 3d at 605-06.

Defendants contest that they are entitled to summary judgment on the Intentional Infliction of Emotional Distress ("IIED") claim, because there is no evidence "to conclude that Deputy Shelton intended to cause [Rios] emotional harm or acted outrageously with reckless disregard to such harm when [Shelton] contacted and detained [Rios,] reasonably believing [Rios] to be the potentially armed suspect." Motion at 27-28.

To state a claim for intentional infliction of emotional distress, a plaintiff must allege "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Hughes v. Pair*, 209 P.3d 963, 976 (Cal. 2009) (internal citations and quotation marks omitted). Conduct is outrageous when it is so "extreme as to exceed all bounds of that usually tolerated in a civilized community" and the defendant's conduct must be "intended to inflict injury or engaged in with the realization that injury will result." *Id.* at 1050-51.

Here, because genuine issues of material fact exist as to the reasonableness of Shelton's seizure-related misidentification of Rios and to the reasonableness of Shelton's use of force on Rios, a reasonable jury could determine that Shelton's conduct rose to the level of reckless disregard of the probability of causing emotional distress. And Defendants do not dispute that Rios alleged he suffered a Traumatic Brain Injury and severe emotional injuries. *See* PUMF ¶ 50; *see also* Ex. E ¶ 25, Dkt. No. 41-10. Therefore, the Court DENIES summary judgment as to the IIED claim.

### H. The County may be held Vicariously Liable on Plaintiff's State Law claims and is thus Not Entitled to Summary Judgment.

Defendants argue that the County of Los Angeles is entitled to summary judgment as to all of Plaintiff's state law claims, because the County is not vicariously liable. Motion at 29. A reasonable juror could conclude that the County is vicariously liable for Rios' injuries. "A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would . . . have given rise to a cause of action against that employee or his personal representative." CAL. GOV'T CODE § 815.2. Thus, if a jury finds that

Shelton is liable for the mistaken-identity seizure and excessive use of force in detaining Rios, the County may be vicariously liable for Shelton's actions.

<strong><u>CONCLUSION</u></strong>

In light of the foregoing, the Court hereby ORDERS as follows:

1. The Court's Findings of Fact are ESTABLISHED for trial;

2. The Motion for Summary Judgment or, in the Alternative, Motion for Partial Summary Judgment, is GRANTED IN PART and DENIED IN PART.

    a. Motion for Summary Judgment is DENIED as to the unreasonable seizure / excessive force, 42 U.S.C. § 1983 claim.

    b. Motion for Summary Judgment is GRANTED as to the municipal liability for failure to train, 42 U.S.C. 1983 claim.

    c. Motion for Summary Judgment is GRANTED as to the municipal liability for unconstitutional custom, practice, or policy, 42 U.S.C. § 1983 claim.

    d. Motion for Summary Judgment is DENIED as to the negligence, Cal. Gov. Code Section 820 claim.

    e. Motion for Summary Judgment is DENIED as to the assault and battery, Cal Gov. Code Section 820 and California Common Law claim

    f. Motion for Summary Judgment is DENIED as to the intentional infliction of emotional distress claim.

    g. Motion for Summary Judgment is DENIED as to the Bane Act, Cal. Civ. Code Section 52.1 claim.

IT IS SO ORDERED.

Dated: October 7, 2025

_____

MAAME EWUSI-MENSAH FRIMPONG

United States District Judge